IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ALFONSO ALTAMIRA-ROJAS et al.,

    Plaintiffs,

v.                                                             Civil Case No.: 3:15-cv-488-JAG

THE CITY OF RICHMOND et al.,

    Defendants.

## OPINION

The plaintiffs bring this action alleging discrimination in the enforcement of building codes against Latino mobile homeowners in the City of Richmond (the "City"). They claim violations under the Fair Housing Act ("FHA"), Title VI of the Civil Rights Act of 1964 ("Title VI"), and the Virginia Fair Housing Law ("VFHL"). The plaintiffs sued the City as well as three individual defendants: Mark Bridgman, John Walsh, and Douglas Murrow (collectively, "the individual defendants"). The individual defendants assert that qualified immunity protects them from the FHA claims and that sovereign immunity protects them from the state law claim. The Court finds that the individual defendants can assert qualified immunity under the FHA and that qualified immunity protects each of the individual defendants in this case. In addition, the Court declines to exercise supplemental jurisdiction over the state law claim against the individual defendants. Accordingly, the Court grants the individual defendants' motion to dismiss.

## I. BACKGROUND

The plaintiffs, residents of either Rudd's Trailer Park ("Rudd's") or Mobile Towne Mobile Home Park ("Mobile Towne"), two of the largest mobile home communities in the City,

filed suit against: the City; Douglas Murrow, the City Building Commissioner; John Walsh, the Operation Manager for the Code Enforcement Division of the Department of Planning and Development; and Mark Bridgman, a Community Assisted Public Safety Program Manager for the Code Enforcement Division of the Department of Planning and Development Review.

The plaintiffs allege that in 2014, the City began a targeted campaign of mobile home inspections that "was discretionary and proactive in both scope and timing." (Am. Compl. ¶ 41.) This resulted in the issuance of many Notices of Violations ("NOVs") and the condemnation of at least some of the mobile homes inspected.

One or two building inspectors, a Spanish speaking interpreter, and sometimes a police officer, carried out the inspections in groups of two or three. The inspectors knocked on the door and asked permission to enter the home. If the resident gave permission, the inspector reviewed the conditions, looked for Virginia Maintenance Code ("VMC") violations, and then informed the resident that the City would issue a NOV in a few weeks if the inspectors found a violation. The plaintiffs allege that for at least some residents that refused permission to the inspectors, the inspectors returned with police officers to ask permission a second time.

The amended complaint alleges four causes of action arising out of the defendants' enforcement of building codes in mobile home parks across the city. The plaintiffs allege that the defendants' actions resulted in violations of the FHA, Title VI, and the VFHL. The plaintiffs also allege retaliation under the FHA. The plaintiffs argue that the defendants' actions had a disparate impact on Latinos and that their actions constituted disparate treatment of Latinos.

The plaintiffs argue that all three individual defendants hold positions high enough in the City's Code Enforcement Division to have crafted and executed the policy of aggressive enforcement of the VMC against mobile home owners. The plaintiffs specifically cite a

comment made by Mr. Walsh in which he said: "There is no trailer park, and there is no trailer park owner, that is going to get away from us this time around." (Am. Compl. ¶ 45.) Mr. Bridgman also allegedly stated that the failure in communication in the enforcement process resulted from the plaintiffs' "low intellect." (Am. Compl. ¶ 95.) In addition, the plaintiffs allege that all three officials were present at several meetings of the coalition working to help the mobile home owners. Those meetings included city representatives, and in them, the City refused to waive the conditions in the NOVs. Finally, Mr. Murrow also sent an email threatening to speed up condemnations on September 12, 2014, if the Legal Aid Justice Center did not confirm representation of the owners of the homes at Rudd's.

The individual defendants and the City filed motions to dismiss and the Court held a hearing on the motions to dismiss on December 9, 2015. At that time, the Court dismissed the Title VI claims and official capacity claims against the individual defendants. Consequently, only the disparate impact, disparate treatment, and retaliation claims under the FHA and the state law claim under the VFHL remain against the individual defendants.

## II. DISCUSSION[1]

### *A. Qualified Immunity under the FHA*

Neither the Fourth Circuit nor the United States Supreme Court has decided whether qualified immunity is an applicable defense under the FHA. The individual defendants claim that the Court should grant them qualified immunity for the FHA claims. The plaintiffs agree that the Court may apply qualified immunity under the FHA, but argue that the Court needs further factual development to determine if the individual defendants qualify for immunity in this case.

The Fourth Circuit has not ruled on qualified immunity under the FHA, but it has extended qualified immunity to defendants sued under the Americans with Disabilities Act ("ADA"). *See Torcasio v. Murray*, 57 F.3d 1340, 1342 (4th Cir. 1995). Within the Fourth Circuit the only court to address the issue of qualified immunity under the FHA, the District of Maryland, held that qualified immunity applies as a defense under the FHA. *See Moxley v. Town of Walkersville*, 601 F. Supp. 2d 648, 665 (D. Md. 2009). While the District of Maryland did not find that qualified immunity applied at the motion to dismiss phase in its case, it did find that qualified immunity could apply to FHA claims. *Id.*

---

[1] A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint; it does not resolve contested facts in the case or the factual basis of a claim or defense. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering the motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiffs. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). The plaintiffs' allegations, however, must consist of sufficient factual matter that, accepted as true, "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This plausibility standard requires the plaintiffs to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Id.*

Every court of appeals that has addressed the question has concluded that qualified immunity applies to claims under the FHA. The D.C. Circuit, the first court to find that qualified immunity applies under the FHA, did not discuss why it applies in the context of the FHA. *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1238-1239 (DC Cir, 1997). The Fifth, Sixth, Eighth and Ninth Circuits have also held that qualified immunity applies under the FHA and have treated qualified immunity claims under the FHA exactly as qualified immunity claims under § 1983 action. *See Hidden Vill., LLC v. City of Lakewood, Ohio*, 734 F.3d 519, 529 (6th Cir. 2013); *Cmty House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 969 (9th Cir. 2010); *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 529-531 (5th Cir. 1996); *Lloyd v. Hous. Auth. of City of Kirksville*, 58 F.2d 398, 400 (8th Cir. 1995).

The Eleventh Circuit, the only court to elaborate on its decision to grant qualified immunity under the FHA, gave two rationales for its decision: (1) that passage of the FHA had not abolished common law immunities of executive officials, and (2) that qualified immunity under the FHA helped to insure the important interest of protecting officials' decision-making capacity. *See Gonzalez v. Lee Cnty Hous. Auth.*, 161 F. 3d 1290, 1299 (11th Cir. 1998). The Eleventh Circuit relied on the Supreme Court's decision in *Scheuer v. Rhodes*, 416 U.S. 232 (1974), in which the Supreme Court found that when Congress passed the civil rights statutes of the late 1800s they gave no clear indication "that Congress meant to abolish wholesale all common-law immunities." *Scheuer*, 416 U.S. at 244; *see also Gonzalez*, 161 F.3d at 1299. The Supreme Court recognized that executive branch officials had qualified immunity from civil damages under the common law and nothing in the codification of § 1983 suggests that Congress meant to overrule this common law immunity. The Eleventh Circuit applied this reasoning to find that qualified immunity exists as a defense under the FHA because nothing in the FHA

5

indicates that Congress intended to "abrogate the qualified immunity to which executive-branch officials were entitled [to] under the common law." *Gonzalez*, 161 F. 3d at 1299.

This Court finds the Eleventh Circuit's rationale compelling and finds that qualified immunity applies under the FHA because Congress, in passing the FHA, did not intend to abrogate the common law qualified immunity of executive officials. In addition, as the Supreme Court has stated, society would face unnecessary social costs including "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office" without qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). This Court finds that qualified immunity creates a necessary protection for the decision-making of executive branch officials, which does not disturb Congress's intent when it passed the FHA.

### B. Qualified Immunity in this Case

Having decided that qualified immunity applies under the FHA, the Court must determine whether it should grant the individual defendants qualified immunity at this stage in the litigation. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Id.* at 818. In addressing qualified immunity, the Supreme Court has formulated a two-prong test under which "a court must determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999). Qualified immunity protects government officials "where the law is unsettled or murky." *Rogers v. Pendleton*, 249 F.3d 279, 286 (4th Cir. 2001). With respect to the second step, "[t]he relevant dispositive inquiry in determining

whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was lawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). A court has discretion to decide which step of the two-prong test to analyze first. *Pearson v. Callahan*, 555 U.S. 223, 242 (2009).

At the time of the official's actions, the constitutional right allegedly violated must be clearly defined in a concrete factual situation such that its contours are clear, unmistakable, and applicable to the precise conduct at issue. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The Court should focus upon the right, not at an abstract level, but at the level of the specific conduct in question. *Simmons*, 47 F.3d at 1385. As the Fourth Circuit has said, the doctrine exists so that "[o]fficals are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

In this case, the Court goes directly to the second step of the qualified immunity analysis and finds that the rights in question under the FHA were not clearly established at the time of individual defendants' conduct. The plaintiffs allege that the individual defendants' enforcement of building codes resulted in violations of the FHA under a disparate impact and disparate treatment theory. They also alleged that the defendants' actions constituted retaliation under the FHA because: (1) the inspectors brought police with them when conducting subsequent inspections in alleged retaliation for homeowners refusing entry to previous inspectors, and (2) the defendants sped up evictions after they received an alternative plan to address the NOVs from plaintiffs' counsel. The plaintiffs also point to the statements of the individual defendants to prove that they had discriminatory intent.

*i. The Disparate Impact and Disparate Treatment Claims under the FHA*

The defendants are entitled to qualified immunity on both the disparate treatment and disparate impact claims because the rights asserted by the plaintiffs were not clearly established at the time of the individual defendants' actions. No case law exists within the Fourth Circuit or from the Supreme Court that suggests that enforcement of building codes against mobile home owners would constitute a violation of the FHA. In addition, nothing in the FHA specifically mentions enforcement of building codes. As the case law suggests, the Court must conduct the clearly established inquiry through concrete factual situations that can be applied to the situation at hand. This does not require there to have been a previous identical factual situation, but rather one that is similar enough that the defendants should have known that their actions violated a bright line rule. While the language and case law supporting the FHA authorizes disparate impact and disparate treatment claims, no case law establishes these claims in the context of building codes. The Court, therefore, finds that these rights were not clearly established and grants qualified immunity to each of the individual defendants.

*ii. Retaliation Claim under the FHA*

The Court also finds that qualified immunity protects the individual defendants from the retaliation claim under the FHA, because case law does not clearly establish that the defendants took adverse action against the plaintiffs for protected activity. Section 3617 of the FHA makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or an account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 2604, or 3606 of this title." 42 U.S.C. § 3617. To state a claim for retaliation, the complaint must sufficiently allege "(1) the plaintiff was engaged in protected

activity; (2) the defendant was aware of that activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action." *Stokes v. Benham*, No. 3:14-CV-536, 2015 WL 4139274, at *7 (E.D. Va. July 8, 2015) (internal citations omitted).

The plaintiffs allege that the defendants accelerated evictions after the plaintiffs' counsel proposed a plan for the mobile home community, and that the defendants continued inspections with police officers after some plaintiffs refused to allow the inspectors into their homes. No case law suggests that bringing police officers to a housing inspection constitutes retaliation. In addition, there is no case law to suggest that conducting lawful evictions after negotiations with opposing counsel constitutes retaliation. The Court, therefore, finds that the individual defendants did not violate a bright line rule that was clearly established. Consequently, the individual defendants are entitled to qualified immunity for all of the FHA claims.

### C. Claims under the VFHL

The Court, having decided that federal claims should be dismissed, declines to exercise supplemental jurisdiction over the state law claim. Pursuant to 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction if the Court "has dismissed all claims over which it has original jurisdiction." Since this Court has dismissed all of the plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over their state law claim.

### III. CONCLUSION

Because the individual defendants are entitled to qualified immunity for the federal claims, the Court grants the individual defendants' motion to dismiss as to those claims. It declines to exercise supplemental jurisdiction over the remaining state law claims.

The Court issued a corresponding Order on December 30, 2015.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: May 4, 2016
Richmond, Virginia

/s/ *[signature]*
John A. Gibney, Jr.
United States District Judge

10